**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**EVERETT PEARSON,**

**Petitioner,**

**v.** **Case No. 8:24-cv-298-TPB-AEP**

**SECRETARY, DEPARTMENT OF CORRECTIONS,**

**Respondent.**
**________________________________/**

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Everett Pearson, a Florida prisoner, filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Having considered the petition, Respondent's response in opposition to the petition (Doc. 10), and Pearson's reply (Doc. 11), the Court **DENIES** the petition.

## Background

This case arises from a sexual assault that occurred behind a Bradenton home in the early morning hours of May 12, 2014. (Doc. 10-2, Ex. 16, at 233, 236-45). The previous day, the victim had been at the house, which was owned by Bobbie Fields. (*Id.* at 232-33, 431). According to the victim, the house was "a place where people [went] to do drugs." (*Id.* at 233). At some point on May 11, Pearson "yell[ed]" at the victim across the street, asking for "sexual favors." (*Id.* at 234). She responded that she "would never

sleep" with Pearson and called him "nasty." (*Id.* at 234-35). The victim left Fields's house and returned early the next morning. (*Id.* at 235-36).

As she stood in front of the house, the victim heard someone "[o]n the side of the building" whisper, "Come here." (*Id.* at 237). The victim walked around the house to "find out who was over there." (*Id.* at 238). At this point, Pearson punched her, dragged her "to the back of the house," threw her onto a broken pool table, and forcibly penetrated her mouth and vagina. (*Id.* at 238-45). He continued to hit her, burned her arm with a cigarette, and pressed a "sharp," "shiny" object against her neck while threatening to kill her. (*Id.* at 240-47, 251). Although the victim initially could not identify her attacker, she saw his face during the incident and recognized Pearson. (*Id.* at 239, 248-49). According to the victim, Fields (the owner of the house) watched the attack from "the bushes" without intervening. (*Id.* at 247-49). The victim eventually escaped, leaving behind her pants, underwear, and shoes. (*Id.* at 253-55).

At the time of the attack, the victim had been awake for approximately three days, and she had used crack cocaine and ecstasy. (*Id.* at 297, 303). She claimed, however, that she was "very aware of what was happening" during the rape. (*Id.* at 305). David Armstrong, a friend of Pearson's, testified that he heard a woman yelling from beside or behind the house, "Why are you doing this to me?" (*Id.* at 350). Soon after, the victim entered the house,

crying and naked from the waist down. (*Id.* at 352). She said, "He raped me and nobody help[ed] me." (*Id.* at 353). Five minutes later, Pearson entered the house to retrieve his bicycle. (*Id.* at 363). Armstrong did not notice any hostility between Pearson and the victim at this time. (*Id.* at 364). Law enforcement subsequently found inside-out jeans, underwear, and flip-flops near the broken pool table. (*Id.* at 319-20).

A nurse examined the victim and collected a rape kit. (*Id.* at 456). The nurse documented facial bruising and abrasions, an injury consistent with a cigarette burn, and an oval bruise on both lower legs. (*Id.* at 450-55). There was no evidence of genital "tears" or "bruising." (*Id.* at 458-59). DNA testing of vaginal swabs excluded Pearson as the source of a partial male profile. (*Id.* at 403-05). The testing produced an unconfirmed CODIS "hit" for Frederick Douglas, the victim's boyfriend. (*Id.* at 405). The victim testified that she had had sexual intercourse with Douglas shortly before the rape. (*Id.* at 282-83). She also stated that Pearson did not appear to ejaculate during the attack. (*Id.* at 245). The DNA analyst explained that intercourse without ejaculation might leave no detectable male DNA on a vaginal swab. (*Id.* at 406).

Pearson was charged with sexual battery involving great force or a deadly weapon. (*Id.*, Ex. 14). The case went to trial. (*Id.*, Ex. 16). Pearson argued that the evidence established, at most, "simple battery," and that the victim's rape allegation reflected either fabrication or confusion from

prolonged sleeplessness and drug use. (*Id.* at 529-37, 543-48). The jury found Pearson guilty as charged, and the trial court sentenced him to life imprisonment. (*Id.*, Ex. 19; Ex. 27, at 26). After an unsuccessful direct appeal, Pearson moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Exs. 34, 36). The postconviction court summarily rejected Pearson's claims. (Doc. 10-3, Ex. 45). The Second District Court of Appeal ("Second DCA") affirmed except for one claim alleging counsel's failure to object to prosecutorial bolstering, which it remanded for further proceedings. (*Id.*, Ex. 48). The postconviction court again rejected that claim, and the Second DCA affirmed without a written opinion. (*Id.*, Exs. 52, 57). This federal habeas petition followed. (Doc. 1).

## Standards of Review

### AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being

presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

**Ineffective Assistance of Counsel**

Pearson alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Pearson must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Pearson must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## **Discussion**

### **Ground One**

Pearson contends that trial counsel was ineffective for failing to call Bobbie Fields as a witness at trial. (Doc. 1 at 7). As explained above, Fields owned the house where the rape took place. (Doc. 10-2, Ex. 16, at 232, 431). At trial, the victim testified that Fields witnessed the attack from "the bushes" without intervening. (*Id.* at 247-49). Later, when the victim asked Fields why he did not help her, he allegedly said, "[W]hatever happens on the block, stays on the block." (*Id.* at 249). Pearson alleges that, if called at trial, Fields would have provided "exculpatory testimony." (Doc. 1 at 7). In particular, Fields allegedly would have denied witnessing the attack, hearing

cries for help, or making the statement the victim attributed to him after the attack. (Doc. 10-2, Ex. 36, at 12-13). According to Pearson, he "informed" counsel about Fields's testimony, but counsel "misadvised [him] [that] it was not necessary to call" Fields. (Doc. 1 at 7).

The postconviction court rejected Pearson's ineffective-assistance claim, finding that counsel "was not deficient for failing to investigate and call Mr. Fields as a witness."[1] (Doc. 10-3, Ex. 45, at 6). The court explained that, during trial, Pearson "engaged in a colloquy with the trial court wherein he was clear that he was choosing not to call Mr. Fields as a witness." (*Id.*) The prosecutor requested the colloquy after noting on the record that "defense witness Bobbie Fields was present here today and just recently listed by the [d]efense." (Doc. 10-2, Ex. 16, at 490). The court asked Pearson, "Have you decided that you don't want to call Mr. Fields?" (*Id.*) He said, "Yes, ma'am." (*Id.*) He then confirmed that he did not "need any further discussion with" counsel about the matter, and that he was "comfortable with" putting on no evidence. (*Id.*) Citing this colloquy, the postconviction court held that Pearson "waived" his ineffective-assistance claim because the trial court "made sure

[1] The Second DCA summarily affirmed the orders denying Pearson's Rule 3.850 motion. (Doc. 10-3, Exs. 48, 57). Thus, unless otherwise noted, the Court looks through the silent affirmance to the postconviction court's decision when evaluating Pearson's ineffective-assistance claims. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

that [he] was aware" that Fields "was available to testify and clarified that [he] had decided against calling him." (Doc. 10-3, Ex. 45, at 7-8).

The postconviction court also held that, even if counsel "were deficient" for failing to call Fields as a witness, Pearson "did not suffer prejudice due to that omission." (*Id.* at 8). According to the court, Fields "would apparently testify that he did not witness any of the events leading up to and including the victim's assault, essentially providing testimony that he was not aware that any such thing had happened." (*Id.* at 9). This would not "tend to prove either that the victim was not raped or that [Pearson] was not her rapist." (*Id.*) Moreover, even if Fields "did not see or hear anything," a "separate witness, David Armstrong, testified that he heard yelling from the backyard as he approached [the] house that evening." (*Id.* at 10). In the court's view, "the jury could possibly conclude" that Armstrong "was lying, but "the simpler explanation" was that "Fields did not hear the yelling." (*Id.*) The court also pointed to "physical evidence indicating that a crime against the victim occurred"—specifically, the nurse's testimony about the victim's "extensive bruising and other injures on the evening in question," and testimony from the crime scene investigator about "the victim's facial injuries and [the] discarded pants and underwear at the crime scene." (*Id.* at 11). Because Fields's proposed testimony "would only assert that he did not see anything relevant to the attack," the court found that it was "not of such a

nature that would cast doubt on the reliability of the outcome of the trial." (*Id.*)

These rulings were reasonable. First, a fairminded jurist could agree that Pearson failed to prove deficient performance. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1340 (11th Cir. 2019) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995)). Moreover, "ineffective assistance does not exist under *Strickland* where the defendant ultimately concurred in his counsel's tactical decision or strategy." *Acuna v. United States*, 494 F. App'x 961, 962 (11th Cir. 2012). The colloquy quoted above shows that Pearson expressly approved the decision not to call Fields as a witness. (Doc. 10-2, Ex. 16, at 490). And Pearson's own allegations establish that, at the time of the colloquy, he knew the testimony he now attributes to Fields. Indeed, Pearson claimed in his Rule 3.850 motion that he "informed counsel of this witness and his exculpatory testimony" before trial. (*Id.*, Ex. 36, at 12-13). "A defendant's knowing acquiescence to his attorney's trial strategy counsels against finding deficient performance." *DiTullio v. Sec'y, Dep't of Corr.*, No. 22-13609, 2025 WL 784713, at *2 (11th Cir. Mar. 12, 2025); *see also Nembhard v. Inch*, No. 20-cv-24822, 2026 WL 806766, at *11 (S.D. Fla. Mar.

24, 2026) ("[Petitioner] can't credibly claim that his lawyer was ineffective when [petitioner] *himself* agreed *not* to call those witnesses.").

Second, the postconviction court reasonably concluded that Pearson failed to show prejudice. The burden of establishing prejudice under *Strickland* "is particularly heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative." *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021). For that reason, "a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." *Id.* Pearson presents no evidence—through an affidavit or otherwise—that Fields would have testified in the manner he suggests. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."). "Without such a showing, [Pearson] cannot demonstrate *Strickland* prejudice." *See Afshar v. Sec'y, Dep't of Corr.*, No. 2:24-cv-826-JES-NPM, 2025 WL 404629, at *5 (M.D. Fla. Feb. 5, 2025) (finding no prejudice from failure to call witness because petitioner did not "offer[] [the witness's] sworn

testimony detailing what he would have said if deposed or called to testify at trial"); *see also Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("[Petitioner] offers only speculation that the missing witnesses would have been helpful. This kind of speculation is insufficient to carry the burden of a habeas corpus petitioner.").

Even if Fields would testify as Pearson suggests, the postconviction court reasonably determined that the testimony would not "cast doubt on the reliability of the outcome of the trial." (Doc. 10-3, Ex. 45, at 11). As the court explained, much of the proposed testimony amounted to an assertion that Fields "was not aware that [the sexual assault] had happened." (*Id.* at 9). In particular, Fields allegedly did not hear someone whisper to the victim, see anyone drag or strike her, or hear her yell from the backyard. (Doc. 10-2, Ex. 36, at 12-13). But these assertions described what Fields failed to perceive; they offered no account of Pearson's whereabouts or of what happened to the victim after she walked around the house. Additionally, nothing in the record suggests that Fields continuously observed the people and locations involved throughout the relevant period. Thus, as the court explained, Fields's proposed testimony would not "tend to prove either that the victim was not raped or that [Pearson] was not her rapist." (Doc. 10-3, Ex. 45, at 9).

Moreover, the postconviction court identified corroborating evidence that Fields's proposed account would leave intact. Armstrong, a friend of

Pearson's, testified that he heard a woman yelling from beside or behind the house, "Why are you doing this to me?" (Doc. 10-2, Ex. 16, at 350). Shortly afterward, the victim entered the house crying, naked from the waist down, and reporting that she had been raped. (*Id.* at 350-54). The victim suffered extensive injuries, including facial bruising and abrasions, an injury consistent with a cigarette burn, and an oval bruise on both lower legs. (*Id.* at 450-55). Additionally, law enforcement found discarded pants and underwear at the scene of the crime. (*Id.* at 319-20). Fields's alleged failure to perceive the attack would not negate this evidence. Given the victim's identification of Pearson and the contemporaneous corroboration of her account, a fairminded jurist could conclude that Fields's proposed testimony would not create a "reasonable probability" of a different outcome at trial. *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014).

**Ground Two**

Pearson claims that trial counsel "misadvised [him] not to testify at trial" and failed to "prepare him to take the stand." (Doc. 1 at 9). According to Pearson, he would have testified that, after he and the victim argued, "both went their separate ways"; he "was not at Mr. Fields's house during the time of the offense" and returned only "to recover his bicycle"; he had "no contact" with the victim in the interim and, upon his return, she was sitting in pajama pants, "did not even appear as if anything had happened to her at all," and

did not speak to him; and officers found "no cuts, scrapes, bruises, swelling, etc. on his hands or arms." (Doc. 10-2, Ex. 36, at 17-18). Pearson contends that counsel's misadvice "depriv[ed] the jury of [this] critical testimony." (*Id.* at 18).

The postconviction court rejected this claim, finding that Pearson did not "suffer[] prejudice for being dissuaded from testifying at trial." (Doc. 10-3, Ex. 45, at 17 (internal quotation marks omitted)). The court began by noting that, if Pearson had testified at trial, the jury would have "becom[e] aware" that he had twenty-one prior felony convictions. (*Id.* at 15). Next, the court explained that Pearson's proposed testimony largely "consist[ed] of statements that he was not at Mr. Fields's house when the victim was raped, did not speak with the victim when he saw her after the rape, and did not have any contact with her in between their verbal altercation and when he saw her after she had been raped." (*Id.* at 16). According to the court, Pearson "provide[d] no additional support for these assertions such as an explanation of where he was or what he was doing." (*Id.*) Instead, Pearson simply "deni[ed] that he was at Mr. Fields's house at [the] time of the crime." (*Id.*) Thus, the court found that the proposed testimony was "not of such a nature that it would have changed the outcome of the trial." (*Id.* at 15).

This ruling was reasonable. A fairminded jurist could agree that Pearson failed to establish a "reasonable probability that the results of the

trial would have been different had [he] testified in his own defense." *Lee v. Culliver*, 300 F. App'x 689, 691 (11th Cir. 2008). At the time of trial, Pearson was a twenty-one-time convicted felon. (Doc. 10-3, Ex. 45, Attachment 14). Thus, if he had testified, Pearson "would have been subject to cross-examination and the jury would have learned that he had a criminal history, which could have damaged his credibility and undermined his" defense. *Preston v. Sec'y, Dep't of Corr.*, 745 F. App'x 835, 839 (11th Cir. 2018); *see also Strozier v. Newsome*, 871 F.2d 995, 999 (11th Cir. 1989) ("[Petitioner's] decision to testify resulted in the introduction of prior convictions which may have had a substantial impact on the jury.").

Moreover, as the postconviction court explained, Pearson's proposed testimony amounted to a denial that he committed the offense. (Doc. 10-3, Ex. 45, at 16). Specifically, he would have acknowledged arguing with the victim but claimed that they had no further contact until he returned to Fields's house after the attack. (Doc. 10-2, Ex. 36, at 17). But, as the postconviction court noted, Pearson provided no "explanation of where he was or what he was doing" during the relevant period. (Doc. 10-3, Ex. 45, at 16). His assertion that he was elsewhere thus provided little beyond a conclusory denial of his presence at the crime scene. Likewise, his claim that officers documented no injuries to his hands would not have materially undermined the victim's corroborated testimony about the incident. In short, Pearson's

unsupported account amounts to "little more than a generic denial of guilt, which is insufficient to establish prejudice." *Hartsfield v. Dorethy*, 949 F.3d 307, 316 (7th Cir. 2020).

**Ground Three**

Pearson contends that trial counsel was deficient for failing to object to several instances of alleged prosecutorial misconduct during closing argument. (Doc. 1 at 10-11). The postconviction court reasonably rejected this claim. (Doc. 10-3, Ex. 45, at 17-22; Doc. 10-3, Ex. 52). "To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). A petitioner cannot establish ineffective assistance for "failure to object to prosecutorial misconduct that, itself, does not warrant reversal." *Land v. Allen*, 573 F.3d 1211, 1221 (11th Cir. 2009).

First, Pearson challenges the prosecutor's comments that the community let the victim down by ignoring her requests for help and that the jury should not likewise "brush her off." (Doc. 10-2, Ex. 16, at 505-07). As the postconviction court explained, the victim testified that "she repeatedly asked for help during and after the attack but had a hard time getting the help she needed." (Doc. 10-3, Ex. 45, at 18; *see also* Doc. 10-2, Ex. 16, at 242, 244, 247, 249, 266-67). Therefore, "the prosecutor was commenting on the evidence

presented during the trial." (Doc. 10-3, Ex. 45, at 18). Because such commentary is a proper function of closing argument, the court reasonably found that counsel had no basis to object. *See Crenshaw v. Sec'y, Fla. Dep't of Corr.*, No. 16-17735-D, 2017 WL 6761058, at *6 (11th Cir. Oct. 18, 2017) (noting that a prosecutor "may comment on the evidence and express the conclusions he contends the jury should draw from the evidence"). Moreover, a reasonable jurist could conclude that the remarks did not prejudice Pearson. (Doc. 10-3, Ex. 45, at 18). The trial court instructed the jury that its verdict must rest "on the evidence" rather than "feelings of prejudice, bias, or sympathy." (Doc. 10-2, Ex. 16, at 569). "[I]mproper statements can be rectified by the [trial] court's instruction to the jury that only the evidence in the case be considered." *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990).

Second, Pearson argues that the prosecutor "fabricated" testimony that the victim saw a knife during the rape. (Doc. 1 at 11; Doc. 10-2, Ex. 36, at 20). At trial, the victim testified that a "shiny," "sharp" object was pressed against her neck while Pearson threatened to kill her. (Doc. 10-2, Ex. 16, at 246-47). As the postconviction court explained, Pearson's argument lacks merit because the prosecutor "was analyzing the evidence provided by the victim rather than fabricating testimony." (Doc. 10-3, Ex. 45, at 19). The prosecutor initially described the victim as saying, "[I]t's a knife." (Doc. 10-2, Ex. 16, at

510-11). But the prosecutor immediately clarified that the victim "was not willing to say" the object was a knife, that she instead described it as a "shiny," "sharp" object pressed against her "neck," and that this description made it likely the object was a knife. (*Id.* at 511-12). Thus, as the court found, any objection to the remarks would have failed because the prosecutor did "not exceed the evidence presented at trial." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014); *see also Mann v. State*, 603 So. 2d 1141, 1143 (Fla. 1992) ("Merely arguing a conclusion that can be drawn from the evidence is permissible fair comment.").

Third, Pearson challenges the prosecutor's statement that the DNA evidence did not "exclude[] [him] from having sexual contact with the victim." (Doc. 10-2, Ex. 16, at 513). This remark was permissible. The DNA analyst excluded Pearson as the source of a partial male profile obtained from the victim's vaginal swabs. (*Id.* at 403-05). But when asked whether the "lack of someone's DNA on a vaginal swab" meant that sexual intercourse with that person had not occurred, the analyst answered: "No, it does not." (*Id.* at 406). She explained that intercourse without ejaculation might leave no detectable male DNA on a vaginal swab. (*Id.*) As noted above, the victim testified that Pearson did not appear to ejaculate during the attack. (*Id.* at 245). Therefore, the prosecutor accurately described the evidence when she remarked that the DNA evidence did not exclude Pearson as the perpetrator. As a result, the

court correctly concluded that counsel had no basis to object to these remarks. (Doc. 10-3, Ex. 45, at 19-20).

Fourth, Pearson alleges that the prosecutor improperly vouched for the victim by twice stating that she was "telling you the truth." (Doc. 10-2, Ex. 16, at 520-21). As the postconviction court explained, counsel had no basis to object to these remarks because the prosecutor "was properly arguing the credibility of the victim based on the evidence presented at trial." (Doc. 10-3, Ex. 52, at 6). The "telling you the truth" remarks were immediately preceded by a discussion of the evidence corroborating the victim's account. (Doc. 10-2, Ex. 16, at 519-21). Specifically, the prosecutor highlighted the victim's flight from the scene while "half naked," the recovery of her discarded clothing near the broken pool table, and Armstrong's testimony about her rape accusation. (*Id.*) The prosecutor then stated that this evidence "show[ed]" that the victim was telling the truth. (*Id.* at 520-21). Thus, the challenged remarks did not "amount to an explicit, personal guarantee of credibility, such as assuring the jury that the prosecution would not have brought the case unless the defendant was actually guilty." *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991). Instead, as the court correctly concluded, the statements were permissible because they rested on "the evidence admitted" at trial. *United States v. Hope*, 608 F. App'x 831, 841 (11th Cir. 2015).

Fifth, Pearson alleges that the prosecutor urged the jury to "agree with me that [Pearson] is guilty beyond a reasonable doubt." (Doc. 10-2, Ex. 16, at 523). As the postconviction court noted, Pearson has taken this statement "out of context." (Doc. 10-3, Ex. 52, at 8). The prosecutor made the remark while explaining "lesser included crimes" to the jury. (Doc. 10-2, Ex. 16, at 523). Specifically, the prosecutor stated that, "[i]f you go through that crime [*i.e.*, sexual battery involving great force or a deadly weapon], you go through those four elements and you agree with me that he's guilty beyond a reasonable doubt, you don't even have to consider those"—*i.e.*, the lesser included offenses of sexual battery and simple battery. (*Id.*) Thus, as the court correctly pointed out, the prosecutor was "not bolstering the State's case but explaining the process for deciding whether a lesser included offense is the appropriate conviction." (Doc. 10-3, Ex. 52, at 9). Counsel had no valid basis to object to these remarks.[2]

**Ground Four**

Lastly, Pearson faults trial counsel for failing to investigate several "potential witnesses" who allegedly would have provided exculpatory

[2] Pearson's Rule 3.850 motion identified other allegedly objectionable remarks, in particular the prosecutor's description of the nurse's testimony and the prosecutor's statement that the victim lacked a motive to lie. (Doc. 10-2, Ex. 36, at 21). The postconviction court concluded that these remarks were not improper. (Doc. 10-3, Ex. 52, at 7-11). In his federal habeas petition, Pearson does not challenge—or even mention—these statements. (Doc. 1 at 10-11). Therefore, the Court need not consider them here. But even if Pearson had raised the additional remarks in his petition, he would not be entitled to relief because the postconviction court reasonably concluded that counsel had no legal basis to object to them. (Doc. 10-3, Ex. 52, at 7-11).

testimony. (Doc. 1 at 13). As explained below, the postconviction court reasonably rejected this claim.[3] (Doc. 10-13, Ex. 45, at 23-33).

David Armstrong

Pearson contends that David Armstrong would have testified that he did not "witness anyone being assaulted or battered" despite hearing a "commotion" before entering the house, that he did not see Pearson at the house when he first arrived, and that the victim did not identify Pearson as her attacker when Pearson showed up to retrieve his bicycle. (Doc. 10-2, Ex. 38, at 2).

As the postconviction court explained, Armstrong "did, in fact, testify [at] the trial." (Doc. 10-3, Ex. 45, at 23). During his trial testimony, Armstrong supplied the information Pearson claims further investigation would have revealed. Specifically, Armstrong denied seeing Pearson inside the house when the victim entered and testified that Pearson appeared five minutes later looking for his bicycle. (Doc. 10-2, Ex. 16, at 354). On cross-examination, Armstrong clarified: "Right before [Pearson] left is the only time I saw him." (*Id.* at 364). Thus, the jury already learned that Armstrong did not see Pearson at the house upon Armstrong's arrival. The jury also heard that Armstrong did not observe the attack and detected no hostility between

[3] To the extent that Ground Four challenges the failure to call Bobbie Fields as a witness, the Court already addressed that claim above.

Pearson and the victim when Pearson came to pick up his bicycle. (*Id.* at 355, 364). Therefore, the court reasonably concluded that counsel was not "deficient with respect to" Armstrong's testimony because his "trial testimony [was] consistent with the testimony that [Pearson claimed] he would have given if counsel had properly investigated him prior to trial." (Doc. 10-3, Ex. 45, at 24).

Jerry Cote

Jerry Cote allegedly would have testified that he never saw Pearson at the house, did not know the victim had been attacked, and did not hear the victim identify Pearson "as her attacker when [Pearson] came to [the] house looking for his bike." (Doc. 10-2, Ex. 38, at 5).

The postconviction court correctly found no reasonable probability that this "proposed testimony" would have "result[ed] in a different outcome in the trial." (Doc. 10-3, Ex. 45, at 26). As an initial matter, Cote's "proposed testimony that he did not see" Pearson at the house "would not be exculpatory" because Pearson himself admits that he was "at the house both before and after the attack." (*Id.* at 25; *see also* Doc. 10-2, Ex. 36, at 17). As for Cote's alleged testimony that he did not know the victim had been attacked, the court correctly noted that there was "ample evidence that the victim was beaten that night, as officers, a crime scene investigator, and a nurse all testified to her injuries." (Doc. 10-3, Ex. 45, at 25). Thus, Cote's

"proposed testimony that he did not know [the victim] had been attacked would only prove that he personally was unaware that anything had happened, not that [Pearson] had not raped the victim." (*Id.*)

Likewise, Pearson suffered no prejudice from the absence of Cote's testimony that he did not hear the victim identify Pearson as her rapist. As the postconviction court explained, "[t]here is no evidence in the record that [the victim] identified her rapist by name to anyone at [the] house." (*Id.*) Nevertheless, a "different witness"—David Armstrong—"did testify that the victim did not react when [Pearson] entered the house after the rape." (*Id.*) Thus, as the court correctly noted, Cote "testifying to the same thing would not be so persuasive that it would result in a different outcome in the trial." (*Id.*)

In short, as the postconviction court noted, Cote's proposed testimony largely consists of "statements that he did not see or hear anything regarding the rape." (*Id.* at 26). Such statements are "severely lacking in context"—Cote "may have been in a different area inside or outside the house when [Pearson] was on the premises, during the time the victim was raped, or later when she came inside looking for help." (*Id.*) Therefore, a reasonable jurist could conclude that Pearson suffered no prejudice from the absence of this testimony.

Lashebra Richards

According to Pearson, Lashebra Richards would have testified that the victim entered the house "with no clothes on from the waist down," that Richards "just gave her a pair of pajamas to put on" and did not "see or hear anything that would . . . corroborate what allegedly happened," and that the victim neither accused anyone present of attacking her nor identified Pearson as her attacker when he came to retrieve his bicycle. (Doc. 10-2, Ex. 38, at 6-7).

The postconviction court reasonably concluded that counsel was not deficient for failing to call Richards at trial. (Doc. 10-3, Ex. 45, at 28). As the court explained, much of Richards's proposed testimony was cumulative of evidence presented at trial. (*Id.* at 26). Specifically, the jury already heard from the victim that a "girl" had given her pajama pants after she entered the house partially unclothed. (Doc. 10-2, Ex. 16, at 255). As for the allegation that Richards heard or saw nothing corroborating the attack, the court correctly noted that the record "refute[d]" this assertion. (Doc. 10-3, Ex. 45, at 26). During a pretrial discussion about Richards's testimony, defense counsel conceded that Richards had heard "cries" outside the house, and the prosecutor proffered that Richards would testify she "heard the victim scream something to the effect of, stop beating me; I'll just give you sex." (*Id.* at 27-28). Pearson offers no basis to question these representations. Thus, as the

court explained, the record shows that Richards "would not have testified as [Pearson] proposes." (*Id.* at 28).

Moreover, the postconviction court correctly identified a separate reason for rejecting the ineffective-assistance claim: Richards "was not available" to testify. (*Id.*) During a bench conference at trial, the prosecutor explained that "[t]he State intended to call [Richards], and she had been subpoenaed, but she did not appear for the trial, and no one was able to locate her." (*Id.*; *see also* Doc. 10-2, Ex. 16, at 359-60). As the court noted, "the State was unable to call" Richards, so she "would have been unavailable for the defense, as well." (Doc. 10-3, Ex. 45, at 28). "Counsel cannot be said to be ineffective for failing to call an unavailable witness." *Williamson v. Moore*, 221 F.3d 1177, 1181 (11th Cir. 2000).

<u>Tammie Jean McGee</u>

Pearson alleges that Tammie Jean McGee, his girlfriend, would have testified that she was not at Fields's house and did not know the victim, that after Pearson was arrested she "called around to find out what happened" and learned that he went to retrieve his bicycle from "that crack house" where "some girl he had an altercation with said that he was her attacker," and that she did not "think" Pearson committed the offense. (Doc. 10-2, Ex. 38, at 6-7).

The postconviction court held that Pearson could not show "prejudice" from the failure to call McGee because "her proposed testimony [was] not relevant or admissible." (Doc. 10-3, Ex. 45, at 29). As the court explained, McGee "was not present at [the] house and ha[d] no direct knowledge of any events that pertain[ed] to the victim's rape." (*Id.*) Moreover, any testimony about "what other people told" McGee "about the night in question" was "inadmissible hearsay." (*Id.*) And McGee's "opinion" about Pearson's "innocence" was "irrelevant." (*Id.*)

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Here, the postconviction court found that Pearson could not show prejudice because, as a matter of Florida law, McGee's proposed testimony was inadmissible. (Doc. 10-3, Ex. 45, at 29). Thus, the postconviction court "already has told us how the issue[] would have been resolved under Florida state law had [counsel] done what [Pearson] argues he should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). This Court is bound to defer to that determination. *See Hagins v. Sec'y*, No. 8:19-cv-3145-TPB-AAS, 2022 WL 17067376, at *4 (M.D. Fla. Nov. 17, 2022) (holding that, in evaluating

*Strickland* claim, a federal court "must defer to the state court's" resolution of "underlying questions of state evidentiary law").

Because the proposed testimony was inadmissible, Pearson cannot show prejudice from the failure to present it at trial.[4] *See Stanley v. Schriro*, 598 F.3d 612, 620 (9th Cir. 2010) ("No prejudice is suffered when counsel declines to pursue the development of testimony that would be inadmissible at trial.").

Frederick Douglas

According to Pearson, Frederick Douglas would have testified that the victim was his girlfriend and they had "intimate relations" the day before the rape, that Fields's house was a "party spot," and that he did not know Pearson well but had "seen him across the street of [Fields's] house." (Doc. 10-2, Ex. 38, at 8-9).

As the postconviction court correctly determined, Douglas's proposed testimony "does not address any contested issues raised during the trial." (Doc. 10-3, Ex. 45, at 29). The victim already acknowledged that she had engaged in sexual intercourse with Douglas before the attack, and that

[4] Notably, Pearson provides no affidavit, declaration, or deposition testimony from Cote, Richards, or McGee substantiating the allegedly exculpatory accounts he attributes to them. As explained above, "a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." *McKiver*, 991 F.3d at 1365. Thus, Pearson's unsubstantiated predictions about how these witnesses would have testified are insufficient to show *Strickland* prejudice.

Fields's house was "a place where people [went] to do drugs." (Doc. 10-2, Ex. 16, at 233, 282-83). Confirming the earlier encounter with Douglas would not undermine the victim's account of the rape. Likewise, as the court pointed out, "whether [Douglas] knew [Pearson] was not at issue" during the trial. (Doc. 10-3, Ex. 45, at 30). Because the proposed testimony "would neither refute existing testimony nor provide exculpatory information," Pearson cannot show deficient performance or prejudice. (*Id.* at 30-31).

<u>Karen Steele and Melissa Lavigne</u>

Karen Steele is the nurse who examined the victim after the attack; Melissa Lavigne is the DNA analyst who tested swabs and "pubic hair combings" taken from the victim. (Doc. 10-2, Ex. 16, at 397-98, 402-03, 441-42, 456-57). Both testified at trial. (*Id.*)

The postconviction court reasonably rejected Pearson's claims concerning these witnesses because the substance of their proposed testimony was already before the jury. (Doc. 10-3, Ex. 45, at 31-33). At trial, Steele acknowledged that there was no evidence of genital "tears" or "bruising," and that the "discoloration" in the victim's mouth could be the result of ingesting ecstasy. (Doc. 10-2, Ex. 16, at 458-59). Likewise, Lavigne testified at trial that Pearson was excluded as the source of a partial male profile obtained from the victim's vaginal swabs, and that she found no "apparent hairs" in the "pubic hair combings." (*Id.* at 403-05). As the court explained, these

statements are "consistent with the testimony [Pearson] proposes his attorney should have elicited." (Doc. 10-3, Ex. 45, at 32-33; *see also* Doc. 10-2, Ex. 38, at 9-11). Therefore, Pearson cannot show deficient performance or prejudice from counsel's alleged failure to "adequate[ly] investigat[e]" these witnesses. (Doc. 10-2, Ex. 38, at 10-11).

## Conclusion

Accordingly, it is **ORDERED** that Pearson's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Pearson and to **CLOSE** this case.

It is further **ORDERED** that Pearson is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a court must first issue a certificate of appealability. To obtain a certificate of appealability, Pearson must show that reasonable jurists would find debatable both (1) the merits of the underlying claim and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Pearson has not made the requisite showing. Accordingly, a certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Pearson must obtain permission from the Eleventh Circuit to appeal *in forma pauperis*.

**DONE and ORDERED** in Tampa, Florida, this 29th day of October, 2026.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**